Patrick R. **CODY**, Plaintiff and Appellee,

v.

**EDWARD D. JONES & COMPANY**, Defendant and Appellant.

No. 17739.

Supreme Court of South Dakota.

Argued Sept. 2, 1992.

Decided June 16, 1993.

Steven M. Johnson and Celia Miner of Johnson, Heidepriem, Miner & Marlow, Yankton, for plaintiff and appellee.

David A. Gerdes of May, Adam, Gerdes & Thompson, Pierre, for defendant and appellant.

AMUNDSON, Justice.

Edward D. Jones & Co. (Company) appeals the trial court's judgment on the jury's verdict for Patrick R. Cody (Cody) and against Company. We affirm.

## FACTS

After graduating from Northern State College in 1973 with a degree in Business Administration, Cody became employed as

the manager of the Elk Point Country Club. Thereafter, he worked at various jobs in sales and bookkeeping until he opened his own implement liquidation business in about 1980. Cody was successful in this business venture and remained in it until 1987 when he purchased a truck and trailer business in Yankton.

Based on this success, Cody sought investment advice from Company in 1981. Cody informed Company's agent, Jim Fitzgerald (Fitzgerald), his investment goals were growth and tax shelter.

Cody initially invested in the following oil and gas ventures: $40,000 in Louisiana General Services, $20,000 in Energy Management Company, and $10,000 in Petro Lewis. Cody was advised and recognized that these investments were risky and eventually lost his entire investment in these oil and gas ventures.

From 1982 to 1985, Cody, under the solicitatious advice of Fitzgerald, invested in four limited real estate partnerships through Company. The investments were as follows:

(1) 1982—Bonaventure, Groundsville, Texas—$76,570;

(2) 1983—Riviera Park, Phoenix, Arizona—$60,500;

(3) 1984—Fox Harbour, Indianapolis, Indiana—$61,600;

(4) 1985—McNeil 2851, Las Vegas, Nevada—$53,000.

Prior to investing in these partnerships, Cody reviewed each investment's prospectus and expressed concern to Fitzgerald about the risk factors mentioned in light of his past experience. Fitzgerald assured Cody each prospectus outlined risk in order to comply with the securities rules and regulations and that, in reality, the investments were not that risky.[1]

Before each investment was made, Fitzgerald was required to fill out an "Offeree Questionnaire" on Cody's qualifications for becoming an investor. In order to qualify Cody for the four partnership investments, Fitzgerald represented Cody's income on these questionnaires in excess of his actual income.[2] Cody was not aware of these misrepresentations of his income when he signed the questionnaires, since Fitzgerald filled in the income figures after the questionnaires were signed by Cody.

Each questionnaire also called for Cody to appoint a "purchaser representative." A purchaser representative is to be a neutral party with no financial stake in the investment who is familiar enough with the purchaser's (Cody in this instance) financial condition to evaluate the offering in light of the purchaser's investment goals and financial ability. Fitzgerald never informed Cody that he was entitled to and required to have a purchaser representative review his investment; rather, Fitzgerald either improperly appointed himself as Cody's representative or indicated that Cody did not need one.[3]

Each of the four investments subsequently failed and Cody brought an action against Company, alleging that Fitzgerald as agent of Company committed acts of fraud and deceit. The jury awarded Cody $228,594 in compensatory damages and

1. When Cody made his first installment on the Bonaventure partnership, he asked Fitzgerald how he could lose all his money on the investment. Fitzgerald replied, "The complete collapse of the United States economy."

2. On the Bonaventure questionnaire, Cody's gross income was listed as $100,000–$150,000, and his taxable income listed as $60,000–$100,000. Cody testified that his taxable income for that time frame was actually $51,000.
On the Riviera Park questionnaire, Fitzgerald listed Cody's gross income for 1983, 1984, and 1985 as $200,000 and his estimated taxable income for the same years as $150,000. Cody testified that his taxable income for 1983 was $26,000, for 1984 was $13,000, and for 1985 was

$70,000. Likewise, Fitzgerald indicated that Cody's net worth was $500,000 to $750,000. Cody testified that his net worth was not that high.
The McNeil Fox Harbour questionnaire listed Cody's gross income as $200,000. Cody testified that his gross income for that time frame was $60,000. Similarly, the McNeil 2851 questionnaire listed Cody's gross income as $200,000.

3. Fitzgerald admitted that he appointed himself Cody's purchaser representative on the Bonaventure purchaser representative form without Cody's knowledge. Fitzgerald placed his own signature on the line designated for Cody's signature as the investor.

$228,590 in prejudgment interest against Company. Company appeals, alleging the trial court erred by denying its motion for a new trial, excluding evidence of the income tax benefits Cody received, failing to have a pretrial hearing on punitive damages, submitting jury instructions on broker's duty to jury, and allowing testimony as to Fitzgerald's similar conduct in misrepresenting another client's suitability for a high-risk investment.

## ISSUES

I. Whether the trial court erred in denying motion for j.n.o.v. or new trial?

II. Whether the trial court erred in excluding evidence of federal income tax benefits to plaintiff?

III. Whether the trial court erred in submitting the issue of punitive damages to the jury without a statutorily required pretrial hearing?

IV. Whether the trial court erred in giving jury instructions 14 and 15 on broker's duties?

V. Whether the trial court erred in permitting the testimony of Theresa Kattke concerning alleged improprieties associated with her account?

## ANALYSIS

*Motion for j.n.o.v. and New Trial*

■ Company claims the trial court erred in denying its motions for j.n.o.v. and new trial because the evidence was insufficient to support the jury's verdict finding company liable for fraud and deceit. Whether a new trial should be granted is left to the sound discretion of the trial court, and this court will not disturb the trial court's decision absent a clear showing of abuse of discretion. *Kusser v. Feller*, 453 N.W.2d 619, 621 (S.D.1990). In determining whether the trial court abused its discretion in denying an application for new trial, this court views the evidence in the light most favorable to the verdict. *Stoltz v. Stonecypher*, 336 N.W.2d 654, 656 (S.D.1983).

■ Our review of the record reveals the evidence, when viewed favorably to the jury's verdict, supports the finding of fraud on the part of Company. This evidence, if believed by the jury, disclosed that Fitzgerald assured Cody that high risk partnership investments were safe investments, sold Cody investments for which Cody was not financially suited, and falsified Cody's income on offeree questionnaires to make it appear as though these were appropriate investments for Cody. Additionally, Fitzgerald failed to disclose to Cody that he was entitled to a purchaser representative for an independent, impartial review and advisement on this investment decision. Therefore, in light of this evidence, we cannot say that the trial court abused its discretion in denying the motions.

*Tax Benefits*

■ Company urges that any award to Cody should be reduced by the tax benefits that Cody received as a result of his investments. The trial court excluded any evidence of tax benefits after considering the motion in limine. The leading case addressing deduction of tax benefits from an award is a securities fraud case. *Randall v. Loftsgaarden*, 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986). In *Randall*, respondents were charged with violations of § 10(b) of the Securities Exchange Act of 1934 and § 12(2) of the Securities Act of 1933. The Court held that neither act authorized the reduction of the trial court's award by the tax benefits the investor received through his tax shelter investment. *Id.* at 667, 106 S.Ct. at 3155, 92 L.Ed.2d at 544. In reaching its decision, the Court relied on the clear intent of the language of the statutes.

However, in deciding not to reduce the damage award by the tax benefits the plaintiff received, the *Randall* court also considered the application of the "tax benefit rule" which makes "the recovery taxable as ordinary income." *Id.* at 664, 106 S.Ct. at 3153, 92 L.Ed.2d at 542. The tax benefit rule is a judicially developed principle that is codified in part in the Internal Revenue Code, 26 U.S.C.A. § 111 (West

1988), and prevents plaintiffs from reaping multiple recoveries. *DePalma v. Westland Software House,* 225 Cal.App.3d 1534, 276 Cal.Rptr. 214, 218 (1990) (citing Mertens, Law of Federal Income Taxation (1990) § 7.74, p. 175). "The tax benefit rule allows the government to recapture past tax benefits awarded to a taxpayer if in a later year an event occurs which changes the basis, or is 'fundamentally inconsistent with the premise upon which the deduction was initially based.'" *DePalma,* 276 Cal. Rptr. at 218 (citing *Hillsboro National Bank v. Commissioner,* 460 U.S. 370, 383, 103 S.Ct. 1134, 1143, 75 L.Ed.2d 130, 146 (1983)). An event is considered "fundamentally inconsistent" when "if that event had occurred within the same taxable year, it would have foreclosed the deduction." *Hillsboro,* at 383–84, 103 S.Ct. at 1143–44, 75 L.Ed.2d at 146.

Allowing Cody to recover his initial investments in the limited partnerships equates to Cody never having made the investments in the first place. If Cody had never invested in the partnerships, he would not have qualified for partnership's losses as a tax deduction. "Under the tax benefit rule, plaintiffs will be required to report any damages recovered in this action as taxable income, resulting in a recapture of their tax benefits, and any prior tax benefits will thereby be disallowed." *Fullmer v. Wohlfeiler & Beck,* 905 F.2d 1394, 1402 (10th Cir.1990). Therefore, any of the losses which Cody initially recorded as tax deductions must now be recorded as taxable income as a result of his recovery in this case and will, therefore, offset the tax benefits originally received.

Since the *Randall* decision, numerous courts have applied its reasoning and refused to reduce damage awards by tax benefits the plaintiff has received prior to the successful prosecution for this damage claim. *Astor Chauffeured Limousine v. Runnfeldt Inv. Corp.,* 910 F.2d 1540 (7th Cir.1990); *Fullmer,* 905 F.2d 1394 (10th Cir.1990); *DePalma,* 225 Cal.App.3d 1534, 276 Cal.Rptr. 214 (1990); *Billings Clinic v.*

*Peat Marwick Main & Co.,* 244 Mont. 324, 797 P.2d 899 (1990). These cases did not limit *Randall's* application to cases involving a claim of security fraud, but refused to reduce awards by tax benefits in cases where recovery was sought on state law fraud, negligence, negligent misrepresentation, breach of contract, and breach of professional duty. *Id.*

Company, on the other hand, cites to opposing authority wherein the courts reduced awards by tax benefits. *See Bridgen v. Scott,* 456 F.Supp. 1048 (S.D.1978); *Froid v. Fox,* 132 Cal.App.3d 832, 183 Cal. Rptr. 461 (1982); *Delacorte v. Transcontinental Land & Cattle Corp.,* 127 Misc.2d 707, 486 N.Y.S.2d 811 (N.Y.Sup.Ct.1985). However, these decisions predate the *Randall* decision and we find them to be unconvincing in their reasoning and will not adopt their holdings.

Furthermore, we find that public policy supports disregarding tax benefits in awarding damages. There is a deterrent value against committing fraud if the fraudulent party realizes he will have to compensate the other party for the full extent of his damages with no offset for any tax benefits the other party may have received. *DePalma,* 276 Cal.Rptr. at 221. " '[I]t is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them.'" *Randall* 478 U.S. at 663, 106 S.Ct. at 3153, 92 L.Ed.2d at 541 (quoting *Janigan v. Taylor,* 344 F.2d 781, 786 (5th Cir.1965)). *See also Astor,* 910 F.2d at 1552. Reducing damage awards by tax benefits in effect awards the fraudulent party government funding to subsidize his fraudulent behavior and greed. *DePalma,* 276 Cal.Rptr. at 221; *Burgess v. Premier Coop.,* 727 F.2d 826, 838 (9th Cir.1984); *Danzig v. Jack Grynberg & Assoc.,* 161 Cal.App.3d 1128, 208 Cal.Rptr. 336, 343 (1984). We likewise refuse to allow Company to not be fully liable for the results of its fraudulent behavior.

We agree with the reasoning of *Randall,* and the lower court[4], in determining that

---

**4.** In ruling on the motion in limine, Judge Hertz stated:

"[A]ny award that the plaintiff should be given by the jury will be … fully taxable be-

application of the tax benefit rule serves to offset any tax benefit Cody received from his investments by requiring him to pay income tax on his recovery. Thus, we find no abuse of discretion on the part of circuit court in excluding this evidence.

*Punitive Damages*

■ Company argues that the trial court erred by submitting the issue of punitive damages to the jury without a formal pretrial hearing. The jury failed to award any punitive damages, making Company's argument moot. " '[A]n appeal will be dismissed as moot where, before the appellate decision, there has been a change of circumstances or the occurrence of an event by which the actual controversy ceases and it becomes impossible for the appellate court to grant effectual relief.' " *State ex rel. Johnson v. Mathis Implement*, 325 N.W.2d 58, 59 (S.D.1982) (quoting *In re Silver King Mines, Permit EX–5*, 315 N.W.2d 689, 690 (S.D.1982)). There is no controversy here because no punitive damages were assessed against Company. The controversy is moot and we will not review it.

*Jury Instructions*

■ Company next alleges the trial court erred in giving jury instructions 14 and 15 concerning the duties of a broker. We review the jury instructions as a whole and will not find them erroneous if they correctly state the law and inform the jury. *Larson v. Kreiser's, Inc.*, 472 N.W.2d 761, 762 (S.D.1991); *Ainsworth v. First Bank of S.D.*, 472 N.W.2d 786, 788 (S.D.1991); *Herren v. Gantvoort*, 454 N.W.2d 539, 542 (S.D.1990); *Frazier v. Norton*, 334 N.W.2d 865, 870 (S.D.1983). The party seeking to set aside the verdict because of erroneous instructions must establish that such instructions were prejudicial. *Runge v. Prairie States Ins. of Sioux Falls*, 393 N.W.2d 538, 541 (S.D.1986).

■ Jury instruction 14 addresses a broker's duty and provides:

A broker owes a customer the following duties:

1. To recommend an investment only after studying it sufficiently to become informed as to its nature, price and financial prognosis.

2. To carry out the customer's orders promptly in a manner best suited to serve the customer's interests.

3. To inform the customer of the risks involved in purchasing or selling a particular security.

4. To refrain from self-dealing or refusing to disclose any personal interest the broker may have in a particular recommended security.

5. Not to misrepresent any fact material to the transaction.

6. To transact business only after receiving prior authorization from the customer.

Company alleges that this instruction is cumulative and gives an unfair advantage to Cody's position. We examine jury instruction 14 in light of the other jury instructions given.

Jury instruction 13 states that the relationship between Company and its customers is fiduciary. *See Davis v. Merrill Lynch, Pierce, Fenner, and Smith*, 906 F.2d 1206, 1215 (8th Cir.1990). Company has not disputed the giving of this instruction. Jury instruction 13 provides:

You are instructed that in South Dakota the relationship between a licensed broker such as Edward D. Jones & Company and its customers is a fiduciary relationship.

Where a confidential or fiduciary relationship exists, it is the duty of the person in whom the confidence is reposed to exercise the utmost good faith in the transaction, to make full and truthful disclosures of all material facts, and to refrain from abusing such confidence by obtaining any advantage to himself at the expense of the confiding party.

---

cause it involves an investment. And the theory is ... that being so, Mr. Cody will then have to pay his share of the income tax. Because the IRS ... indicates that while you

may claim a loss in certain years, you must also report a recovery of that loss in subsequent years for income tax purposes." Trial Record 11.

Jury instruction 13 thus lays out a fiduciary's duties in broad terms.

Some of jury instruction 14 is similar to jury instruction 13. Jury instruction 13's reference to refraining from abuse of a confidence is similar to jury instruction 14(4) prohibiting self-dealing. Likewise, "full and truthful disclosures" in instruction 13 is similar to instruction 14(3) requiring the broker to inform the customer of risks. The mere fact that these instructions are somewhat duplicative or cumulative does not warrant a reversal of this verdict. Company failed to establish, on this record, that the giving of these instructions prejudiced its case.

Company cites *DeSciose v. Chiles, Heider & Co., Inc.*, 239 Neb. 195, 476 N.W.2d 200 (1991), for the proposition that no fiduciary relationship arises merely because of a broker-client relationship. However, in accepting jury instruction 13, Company acknowledged the presence of a fiduciary relationship. Therefore, it is inconsistent to dispute the relationship's existence for purposes of instruction 14.

■ Company also argues that the duties listed in instruction 14 are applicable only to cases of Securities Acts' violations. The case from which instruction 14 is derived is in fact a Securities Act case. *Leib v. Merrill Lynch, Pierce, Fenner & Smith*, 461 F.Supp. 951, 953 (E.D.Mich.1978). While we find these duties to be a correct statement of the law, the underlying action is for fraud and deceit, not breach of fiduciary duty. The jury was properly instructed as to the elements of fraud and deceit in instructions 18, 19, and 20. Because breach of fiduciary duty was not alleged in this case, use of instruction 14 to further explain a broker's duties was unnecessary.

However, Company has the duty of proving that the additional jury instruction did in fact work a prejudice on it. *Runge v. Prairie States Ins. of Sioux Falls*, 393 N.W.2d 538, 541 (S.D.1986). While jury instruction 14 may have been unnecessary for an action in fraud and deceit, we cannot say that its use rose to the level of prejudice. The instruction is a correct statement of the law and merely more thoroughly outlines the obligations of a broker to his client than does instruction 13. Evidence at trial indicated a violation of the duties in instruction 14 sufficient to constitute fraud and deceit as properly defined in jury instructions 18, 19, and 20. Therefore the giving of instruction 14 does not rise to the level of being prejudicial to Company's defense.

■ Company also alleges that jury instruction 15 was improper. Jury instruction 15 provides:

Where a customer is uneducated or generally unsophisticated with regard to financial matters, the broker will have to define the potential risks of a particular transaction carefully and cautiously.

Company again alleges that there is no fiduciary relationship between Cody and Company. Viewing the jury instructions as a whole, Company has acknowledged the existence of a fiduciary relationship in its acceptance of jury instruction 13. However, this court agrees that Cody does not qualify as "uneducated or generally unsophisticated with regard to financial matters" as set forth in this instruction. Cody was a business graduate of Northern State College, had owned and successfully operated his own business, had made prior investments in securities, and had read and questioned the prospectuses of the partnerships. This does not depict Cody as an uneducated or unsophisticated investor for the purposes of this instruction. This instruction could literally be construed as somewhat misleading. However, when considering all the instructions given by the court as we must do, giving of this instruction does not constitute prejudice sufficient to warrant reversal. *Runge*, 393 N.W.2d at 541.

*Testimony of Theresa Kattke*

■ Finally, Company alleges the trial court erred in admitting the testimony of Theresa Kattke (Kattke). At the pretrial hearing, Company, through a motion in limine, objected to Kattke's testimony. The trial court held that Kattke's testimony would be allowed only for the purpose of impeaching Fitzgerald's testimony. The

court, therefore, required that Cody call Fitzgerald as an adverse witness prior to Kattke's testimony. Following Fitzgerald's testimony, Cody was required to make an offer of proof as to how Kattke's testimony would impeach Fitzgerald.

During his examination, Fitzgerald testified that he had not previously misrepresented a client's income for the purpose of qualifying the client for an investment. Fitzgerald then specifically denied ever altering a client's net worth figure for investment in NRM. Following this testimony, Cody made an offer of proof that Kattke's income figure had been altered by Fitzgerald specifically to qualify her for an investment in NRM. The court ruled that Kattke's testimony would be allowed for the purpose of impeaching Fitzgerald's credibility.

"A trial court's evidentiary rulings are presumptively correct. In reviewing the trial court's ruling, we must determine if the trial court abused its discretion." *Opp v. Nieuwsma*, 458 N.W.2d 352, 357 (S.D. 1990). An abuse of discretion is a discretion "exercised to an end or purpose not justified by, and clearly against, reason and evidence." *Gross v. Gross*, 355 N.W.2d 4, 7 (S.D.1984).

 Extrinsic evidence may be introduced at the discretion of the court if the evidence is probative of truthfulness or untruthfulness. *Larson*, 472 N.W.2d at 764. Kattke's testimony was probative of whether or not Fitzgerald's testimony was worthy of belief and was appropriate evidence for the jury to receive when having the duty to decide issues of witness credibility. Kattke's testimony refuted both the general statement by Fitzgerald that he had never falsified another client's income and the more specific statement that he had never falsified the income of a client investing in NRM, an investment that Kattke made. The trial court's admission of Kattke's testimony for impeachment purposes was not clearly against reason and evidence and thus not an abuse of discretion.

Accordingly, the decision of the trial court is affirmed in all respects.

MILLER, C.J., and WUEST, HENDERSON and SABERS, JJ., concur.